**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | | |
|---|---|---|
| **In re:** | ) | |
| | ) | **Case No. 11-16929-BFK** |
| **JAMES E. CORUM, IV** | ) | **Chapter 13** |
| **CHRISTINA MARIE CORUM** | ) | |
| | ) | **NOT FOR PUBLICATION IN** |
| **Debtors** | ) | **WEST'S BANKRUPTCY REPORTER** |

**MEMORANDUM OPINION**

This matter arises out of the unauthorized sale of the Debtors' property located at 6695 Clarkes Meadow Drive, Bealeton, Virginia 22712 (the "Property"). The culpability of the parties ranges from the highly blameworthy (the Debtors), to the indisputably innocent (the purchaser of the Property and her real estate agent). Somewhere in-between lies the conduct of the other involved parties: the Debtors' real estate agent; the settlement agent; and the company that processed the sale as a short sale for the Debtors, EAG Associates, LLC ("EAG").

Pending before the Court are: (a) the Debtors' Motion to Approve Sale of Real Property (Docket No. 31); (b) the Court's Order to Show Cause Why Case Should not Be Converted to Chapter 7 or Dismissed, and Why Amounts Paid in Connection with Unauthorized Sale of Property of the Estate Should Not Be Disgorged (Docket No. 38), and Order Scheduling Evidentiary Hearing and Requiring Attendance of Interested Parties (Docket No. 48); (c) the Chapter 13 Trustee's Motion to Convert or Dismiss (Docket No. 54); and (d) the Debtors' Second Amended Chapter 13 Plan (Docket No. 65).

The Court held two evidentiary hearings in this case: the first on June 21, 2012, and the second on August 24, 2012.  The Debtor[1], Re/Max Choice, Fieldstone and the Chapter 13 Trustee were present at the June 21st hearing.  EAG and Blackwell Title were not present at the hearing on June 21st.  The Court continued the matter to August 24th, and ordered that all parties, including EAG and Blackwell Title, be present at that hearing.  At the August 24th hearing, EAG was present and represented by counsel and Blackwell Title was present by Mr. Cheatwood, but was not represented by counsel.

After hearing all of the evidence, the Court will: (a) declare the Purchaser, Ms. Pearce, to be a good faith purchaser for value and approve the sale as a sale to a bona fide purchaser without knowledge of the commencement of the case and for present fair equivalent value under 11 U.S.C. §  549(c); (b) deny confirmation of the Debtors' Amended Chapter 13 Plan and convert the Debtors' case to Chapter 7; (c) decline to sanction the purchaser's agent, Fieldstone Real Estate; (d) sanction the Debtors' real estate agent Re/Max Choice in the amount of $7,050; (e) sanction Blackwell Title & Escrow, LLC, the sum of $275; (f) decline to sanction EAG, without prejudice to whatever rights or claims the Chapter 7 Trustee may assert.  All sanctions shall be payable to the Chapter 7 Trustee in this case.  In the event, however, that the bankruptcy estate has sufficient funds to pay all administrative expenses, priority claims and allowed unsecured claims in full, then the Court will order that no funds are to be paid to the Debtors, and any excess funds shall be returned to the sanctioned parties, *pro rata* to the amounts that they have paid into the estate.

### FINDINGS OF FACT

The Court makes the following findings of fact:

---

[1] Mrs. Corum did not attend either of the evidentiary hearings.  References to the Debtor, in the singular, in this Opinion are to Mr. Corum.

**Pre-Petition Events**

1.        Prior to the time that the Debtors filed their bankruptcy petition, they were

working on a short sale of their property with Carmen Gill, a real estate agent with Re/Max

Choice.

2.        Ms. Gill referred the Debtors to Alex Ciaccio of EAG, in Sarasota, Florida, to

assist with the short sale process.  Tr. II at 76, Aug. 24, 2012.[2]  Mr. Ciaccio is highly experienced

at negotiating short sales.  Tr. II at 155.  He works with various lenders, and he knows what the

lenders require in order to approve a short sale. Tr. II at 139-40.  For example, Mr. Ciaccio

makes sure that a broker's price opinion, or BPO, is timely ordered, so that the lender has an idea

of the value of the property.  Tr. II at 159.  Mr. Ciaccio, in short, stays "on top" of the lender, to

ensure that the short sale can be processed and approved consistent with the lender's guidelines

and policies. Tr. II at 139-40.

3.        On August 23, 2011, Mr. Corum entered into a written *Disclosure Between EAG*

*& Associates and Sellers*.  EAG Ex. 1.

4.        In this case, the loan was serviced by Litton Loan Servicing.  However, on

September 28, 2011, EAG was advised that the loan had been transferred to Ocwen Loan

Servicing, LLC ("Ocwen").  EAG Ex. 3, p.9.

**The Debtors' Bankruptcy Case**

5.        On September 22, 2011, the Debtors filed their voluntary bankruptcy petition

under Chapter 13, in this Court.

6.        On October 6, 2011, EAG noted that Ocwen was showing an "active Chapter 13

bankruptcy" for the Debtors.  EAG Ex. 3, p.7.

---

[2] References to "Tr. I" are to the transcript from the June 21st hearing.  References to "Tr. II" are to the August 24th
hearing.

7.      On October 7, 2011, the Court entered an Order of Dismissal for Failure to

Timely File and Distribute Chapter 13 Plan.  Docket No. 18.  A Notice of Dismissal was entered

on the Docket by the Clerk.  Docket No. 19.

8.      The Notice of Dismissal was faxed to EAG on October 9, 2011.  EAG Ex. 2.  Just

who faxed this to EAG remains a mystery.  The sending Fax number is 703-369-9009.  Tr. II at

64.  The Debtor testified that he did not fax it to EAG.  Tr. II at 36-38.  He further testified that

he was sure that his wife did not fax this to EAG.  Tr. II at 38-39.  Ms. Gill testified that she did

not fax it to EAG.  Tr. II at 64-66.  Regardless of its origin, it was faxed to, and received by,

EAG on October 9, 2011.  EAG Ex. 2; EAG Ex. 3 at 5-7.

9.      On October 10, 2011, the Debtors filed a Motion to Vacate Order Dismissing

Case.  Docket No. 21.  This Motion was granted by Order entered November 17, 2011.  Docket

No. 26.

10.      Ocwen Loan Servicing, LLC, filed Proofs of Claim Nos. 2-1 and 3-1 in this

bankruptcy case on September 30, 2011.  Notice by electronic transmission of the reinstatement

of the case was sent to Ocwen by the Bankruptcy Noticing Center on November 19, 2011.

Docket No. 28, p.3.

### The Debtors' Motion for Approval of a Short Sale

11.      On December 15, 2011, the Debtors filed a Motion for approval of a short sale of

the Property.  Docket No. 31.

12.      On December 27, 2011, the Court entered an Order with respect to the Debtors'

Motion for approval of the short sale.  Docket No. 34.  The Order provided as follows:

> This matter comes before the Court on the Debtors' Motion for approval of a short sale
> of the Debtors' real property and improvements located at 6695 Clarks Meadow Drive,
> Bealeton, VA 22712. Docket No. 31. The Motion seeks the immediate approval of a short
> sale of the property, and represents that the purchasers must close by December 29, 2011,

4

or they will walk. Motion, ¶ 5. The Motion was filed on December 15, 2011, but no motion to expedite the hearing on the Motion was filed with the Court. There was also no certification of a need for an expedited hearing, pursuant to Local Rule 9013-1(N). This notwithstanding, it is hereby

**ORDERED** that entry of the Debtor's proposed Order approving the sale will be temporarily withheld, pending the following:

1. The Motion represents that the same lienholder, Ocwen, holds or services the first and second mortgages on the property. Mr. Jaffe has entered his appearance in the case as counsel for Ocwen. Docket No. 17. The Order must be endorsed by counsel for Ocwen, evidencing Ocwen's consent to the sale as holder or servicer of the first and second mortgages on the property.

2. The Debtors' Schedule E represents that there are substantial tax liabilities, going back to 2008. Docket No. 14, Schedule E. The Motion must either be accompanied by a title report showing that there are no tax liens, or counsel for the Debtor's certification that he has secured a current title report showing no tax liens. If there are any tax liens, the Order must be endorsed by counsel for the taxing authorities, evidencing their consent. See 11 U.S.C. §§ 363(f)(3) (sale must be for "greater than the aggregate value of all liens on such property"), and (f)(2) (lienholder may consent to a sale free and clear of its interest in the property). The Clerk will mail a copy of this order, or give electronic notice of its entry, to the parties listed below.

*Order*, Docket No. 34.

13.    The Debtors did not provide the items required by the Court's Order of December 27th, and the Court never approved the sale.  The Court heard nothing more about the sale until the Debtors filed a Notice of Hearing on May 16, 2012.  Docket No. 36 (noticing the previously filed Motion for approval of the short sale for a hearing on the Court's docket of June 7, 2012).

**The Closing on the Short Sale**

14.    On the same day as the Court's Order, December 27th, at 4:46 p.m., Carmen Gill of Re/Max Choice sent an e-mail to John Cheatwood at Blackwell Title, to Mr. Goetz who is

5

counsel for the Debtors, and to Christopher Williams who is the real estate broker for the seller.

The e-mail was entitled "We Cannot Close Tomorrow!" Ex. 5.[3] It stated in its entirety:

> It will not close tomorrow.  In speaking with John Goetz with John Carter Morgan, Attys
> at Law, he has to submit to the Judge of the Bankruptcy Court a copy of Title Search,
> showing that there are no tax liens against the property.  If the Title work shows that there
> are no Tax Liens, he will need to file it with the Court.  John at Blackwell: Please provide
> Mr. Goetz with the requested info.  He is going to attempt to have the Judge sign off on
> an Order for us to proceed to close but cant [sic] guarantee the timeliness of the issue.
>
> The Judge just entered the Order requiring things to be done to approve the sale.  Please
> correspond with him ASAP and get to him any required docs needed.  Thanks.
>
> We also will need to file an Addendum extending the close date.  The thing here is that
> according to Mr. Goetz is that Ocwen will have to sign off on the Order (language says
> that there will be no deficiency claim in the payoff agreement).  Thanks.

Ex. 5, p.1.

15.     The December 27th e-mail quoted above was not sent to EAG.

16.     The sale closed without Court approval on the following day, December 28, 2011.

Ex. 2.  The HUD-1 Settlement Statement indicates that the purchase price was $235,017.48.  Ex.

2.  The following parties were paid in the following amounts, at or shortly after the settlement:

| | |
|---|---|
| Ocwen | $161,679.00 |
| Re/Max Choice | $7,050.00 |
| Fieldstone | $7,050.00 |
| Blackwell Title | $275.00 |
| EAG | $55,546.18 |

Ex. 2, Lines 504, 701, 702, 1102 and 1308.

17.     Ocwen approved this sale as a short sale, and it approved the payment to EAG.

EAG Ex. 5.

18.     Ocwen actually issued two lender approval letters.  Ex. 1; EAG Ex. 5.  They are

both dated November 29, 2011.  The first one had to be corrected because it did not include

---

3   Exhibits that are simply referred to as "Ex. (No.)" as opposed to "Trustee Ex. 1," or "EAG Ex. 1," are the
Exhibits that were preliminarily entered into evidence at the first evidentiary hearing on  June 21, 2012, and that
were entered into evidence at the August 24, 2012, hearing without objection.

EAG's fee. *See* Ex. 1. In both approval letters, there is no approval of any Assistance Payment

to Mr. and Mrs. Corum. *See* Ex. 1; EAG Ex. 5 ("Ocwen Loan Servicing, LLC ('Ocwen'), acting

on behalf of [NHELI 2006-FM1] ('Investor') has approved a discounted payoff of the above

referenced loan . . . and subject to the conditions set forth herein, an assistance payment to the

borrower of $N/A ('Assistance Payment')").

19.      Further, Mr. Corum signed an Affidavit of "Arm's Length Transaction," which

states in part: "You [Borrower] may not have any agreements to receive a portion of the

commission or the sales price after closing . . . Any knowing violation of the arm's length

transaction prohibition may be a violation of federal law." *Aff. of Arm's Length Transaction,* Ex.

1, p. 5.

### The Debtors' Renewed Motion for Approval of the Sale

20.      On May 16, 2012, the Debtors filed a Notice of Hearing, noticing the previously

filed (and conditionally denied) Motion for approval of the sale for a hearing on the Court's

docket of June 7, 2012. Docket No. 36. At the June 7th hearing, the Debtor's counsel advised

the Court that the sale had closed on December 28th without Court authorization. The Court

reviewed the HUD-1 Settlement Statement from the December 28th closing, noting that EAG

was paid $55,546.18 in connection with the sale. The Court then issued its Show Cause Order of

June 11, 2012. Docket No. 38.

21.      Mr. Cheatwood of Blackwell Title, testified at the August 24th hearing that this

was the first bankruptcy-related closing that he had handled in his 27 years in real estate. Tr. II

at 105. He testified that he hand-delivered to Mr. Goetz's office what he thought Mr. Goetz

needed: Ocwen's approval letter and a title report showing that there were no other liens. Tr. II

at 111. Believing that he had satisfied the Court's concerns, he went ahead and closed the

transaction at 10:00 a.m., on the morning of December 28th.  Tr. II at 107.  However, these items

were not brought to the attention of the Court, and as noted, the Court never approved the sale.

22.     Mr. Corum, the debtor, testified at both the June 21st hearing and the August 24th

hearing that, prior to the closing on December 28th, he left for Dallas, to watch his son play in a

football game.  Tr. I at 16-17, June 21, 2012; Tr. II at 40-41.  He and his wife signed the

settlement papers and then he delivered them to the settlement agent before leaving for Dallas.

Tr. II at 40-41.  He testified that once he left for Dallas, as far as he knew, the Property was "off

of his plate," and that he did not become aware of any problems concerning the sale until the

Court's Show Cause Order of June 11, 2012.  Tr. II at 58.

23.     Subsequent to the closing, Mr. Ciaccio mailed two $5,000 checks to Mr. Corum.

Tr. II at 49.  Mr. Corum admitted that he requested the two $5,000 checks because he believed

that they would be easier to cash at a bank, rather than one $10,000 check.  Tr. II at 51-52.

24.     The $10,000 payment to Mr. Corum was not listed on the HUD-1 Settlement

Statement.  *See* Ex. 2.  There is no evidence that it was ever disclosed to Ocwen.  It certainly was

never disclosed to the Court, and the Court never approved it.

25.     With respect to these two checks, the Debtor testified that prior to the closing, Mr.

Ciaccio called him and told him that he could obtain $10,000 from the sale for him.  Tr. I at 20,

23 ("and this is before we went to closing;" "That was before [he signed the settlement

documents]").  The Debtor was equally adamant in his testimony at the August 24th hearing that

this call was before Christmas, and he distinctly remembered that Mr. Ciaccio said that he would

provide this payment as a "Christmas present."  Tr. II at 42-43, 50-51.

26.     Mr. Ciaccio, for his part, acknowledged that he made the call, but he testified that

he made the call after the December 28th closing.  Tr. II at 166-67.  Mr. Ciaccio testified that he

was once in Mr. Corum's circumstances; that he had once filed for bankruptcy.  Tr. II at 167.

Mr. Ciaccio testified that he was sure that the call was made after the closing on December 28th,

because he did not want to promise money to Mr. Corum that he might not receive from the

closing, noting that at times, investors will refuse to approve his fees, even when agreed to by the

Lender.  Tr. II at 167.

27.     At the June 21st hearing, Mr. Corum first denied having received any money from

the sale.  Tr. I at 19-20 ("Q: And you didn't receive any money from the settlement yourself?  A:

No;" "Q: You just answered but let me ask you again.  You didn't receive any money or other

consideration or remuneration for this sale? A: No, not for the sale.")

28.     It was only when pressed that Mr. Corum then admitted that he in fact had

received the $10,000.  Tr. I at 20-21.  With respect to the disposition of the $10,000, Mr. Corum

testified as follows:

> Q:     How much money did you receive from EAG?
> A:     He sent me two checks for $5,000.
> Q:     And what did you do with those checks?
> A:     I paid off some unsecured debt that I owed prior to some friends and
> family members.
> Q:     Were those debts not listed on –
> A:     That weren't listed. These were cash debts. When we did the Chapter 13, I
> didn't want to put the family members and friends, you know, because I wanted
> them paid off, in other words, whether I had to work extra hard to get it paid off
> or so and so.

Tr. I at 21.

29.     Subsequently, at the August 24th hearing, Mr. Corum openly admitted that he

"lied" about the disposition of the $10,000.  He testified as follows:

> Q:     The last time you testified, you testified – and again, I am paraphrasing.
> You said that you received the money and used that money to pay debts owed to
> friends and relatives.  After reflection on your testimony, is there anything you
> want to change?

A:      Yeah. That day, I – you know, I came in here not knowing what to expect. I was thrown up here on the stand.  It was false, what I said about the debtorers [sic].  When I filed bankruptcy, every debtorer [sic] that I had was listed in my bankruptcy.

. . .

Q:      And you testified falsely because you really didn't know what to expect, correct?

A:      Correct.

. . .

Q:      And I asked you earlier was your attorney involved with some of these deficiencies and you weren't really clear about that?

A:      Well, like I said before, I can – I'm guilty of taking money.  Okay?  That's where I'm guilty at.  I'm guilty for coming down here last time and basically not telling the truth on what I did with the money.

Tr. II at 28-29, 35, 45-46.

30.      On August 21, 2012, just before the August 24th evidentiary hearing, the Debtors filed their Second Amended Chapter 13 Plan.  Docket No. 65.  The Amended Plan proposes to pay: (a) $2,200 per month for 49 months; and (b) the sum of $15,055, payable immediately to the Chapter 13 Trustee.  Docket No. 65, § 1.  This would, according to the Amended Plan, result in a distribution to the unsecured creditors of approximately 54% of their allowed claims.  Docket No. 65, § 4(A).[4]

31.      In sum, the Court finds: (a) the sale of the Property was unauthorized; (b) the Court had specifically not authorized the sale in its Order of December 27th; (c) Re/Max Choice was aware of the bankruptcy filing at the time of the closing on December 28th; (d) Mr. Cheatwood of Blackwell Title was aware of the bankruptcy when he conducted the closing; (e)

---

[4]   The Amended Plan provides that any claim for a deficiency by Ocwen will be deemed to be withdrawn, and the Chapter 13 Trustee shall not pay any amount on a deficiency claim by Ocwen.  Docket No. 65 § 11.  Section 11 also provides: "Furthermore, unless evidence is provided that shows that the proceeds of the sale were not distributed in accordance with the terms agreed to by the creditor, Ocwen Loan Servicing, LLC, shall be barred from filing a deficiency claim as a result of the sale of the collateral property."  As the Court has found, above, the proceeds of the sale were not in fact distributed in accordance with Ocwen's approval letter, which did not approve any Assistance Payment to the Corums.  If as a result, Ocwen is entitled to file a deficiency claim (something on which the Court makes no ruling at this time), then the distribution to the unsecured creditors could be considerably less than the 54% advertised in the Amended Plan.

the purchaser, Ms. Pearce, and her agent at Fieldstone, had no reason to know of the bankruptcy,

and Ms. Pearce is a good faith purchaser for value without knowledge of the case; (f) EAG was

provided with a Notice of Dismissal of the bankruptcy case, and had no reason to believe that the

case had been reinstated; (g) the $10,000 payment to the Debtors was not disclosed to, nor

approved by, the Court; (h) the $10,000 was not listed on the HUD-1 Settlement Statement; (i)

the $10,000 was not disclosed to, nor approved by, Ocwen.

## CONCLUSIONS OF LAW

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the Order of

Reference of the U.S. District Court for this District of August 15, 1984.  This is a core

proceeding, within the meaning of 28 U.S.C. § 157(b)(2)(A) (matters concerning the

administration of the estate).  Venue is appropriate in this Court pursuant to 28 U.S.C. § 1409(a).

Short sales have become increasingly prevalent, both inside and outside of bankruptcy

cases.  Lenders have awakened to the fact that a sale of their collateral for somewhere near

market value avoids foreclosure costs, and carrying costs, including maintenance, insurance and

real estate taxes.  Borrowers often are eager to complete a short sale, owing to their continuing

maintenance, real estate taxes and homeowners' dues (or condominium assessment) obligations.

Like Mr. Corum, many homeowners are eager to get the property "off their plate," and to get on

with their financial lives without the continuing burdens of an underwater property.

Homeowners in this situation are also eager to avoid liabilities for deficiency claims from lenders

in the event of a foreclosure.  Congress, for its part, has encouraged short sales by providing that

the forgiveness of lenders' deficiency debts in short sales is not taxable as debt forgiveness

income, at least through the end of 2012.  *See* Mortgage Forgiveness Debt Relief Act of 2007,

Pub. L. No. 110-142, 121 Stat. 1803, and Emergency Economic Stabilization Act of 2008, Pub.

L. No. 110-343, 122 Stat. 3765; *see also The Mortgage Forgiveness Debt Relief Act and Debt*

*Cancellation*, IRS.gov, http://www.irs.gov/Individuals/The-Mortgage-Forgiveness-Debt-Relief-

Act-and-Debt-Cancellation (last visited Nov. 08, 2012).  This is all a perfectly rational and

legitimate reaction to the bursting of the real estate bubble, where millions of homeowners find

themselves underwater with respect to the mortgages on their homes.

 The problem, for which this case is a paradigm example, is that in a bankruptcy case, the

rules still apply.  The Debtors' property in this case was unquestionably property of the estate.

11 U.S.C. § 541(a)(1).  The sale was not a sale in the ordinary course of the Debtors' business, so

Court approval of the sale was required.  11 U.S.C. §§ 363(b)(1) and 1303.[5]  It is universally

accepted that the terms of a proposed sale not in the ordinary course must be disclosed to the

Court and to all creditors and parties in interest.  *See In re Oakwood Country Club, Inc.,* 2010

WL 4916436 (Bankr. W.D. Va. 2010); *In re Hat*, 310 B.R. 752 (Bankr. E.D. Cal. 2004); *WBQ*

*P'ship v. Va. Dep't of Med. Assistance Serv.* (*In re WBQ P'ship*), 189 B.R. 97, 102 (Bankr. E.D.

Va. 1995); *In re Del. & Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991).  In this case, the sale

suffers from two fundamental defects: (a) it was never approved by the Court; and (b) the terms

of the sale, in particular, the $55,000 payment to EAG and the $10,000 payment to the Debtors,

were never disclosed to the Court, nor to the creditors and other parties in interest.

 As noted above, the Court views the culpability of the parties in this case on a sliding

scale, from "very culpable" to "not culpable at all," with some parties falling somewhere in

between.  The Court will address each of the parties, in turn.

---

[5]  Section 1303 of the Bankruptcy Code gives Debtors in Chapter 13 the power to sell property under Sections
363(b) (sales not in the ordinary course) and 363(f) (sales free and clear of liens, claims and interests).

*1. The Debtors*

Without a doubt the Debtors are the most culpable parties here.  They filed a voluntary

petition in this Court, seeking the Court's protection.  They are not charged with knowing the

intricacies of the Bankruptcy Code and Rules.  Rather, they are charged with dealing with property

of the estate in an open and honest manner, and with full disclosure to the Court, the creditors and

other parties in interest (including the Chapter 13 Trustee).  This they failed to do.

The funds received by Mr. and Mrs. Corum in connection with the sale were proceeds of

property of the estate pursuant to 11 U.S.C. §§ 541(a)(1), 541(a)(6) and 1306(a)(1).  Mr. Corum

lied at first about the receipt of the $10,000 at the June 21st hearing, then lied about the

disposition of the $10,000, until he admitted his lies at the August 24th hearing.  The

unauthorized transfer of the Property, together with Mr. Corum's lies to the Court about the

$10,000 payment, are grounds to convert his case to Chapter 7.

The grounds for conversion are stated in Section 1307 of the Bankruptcy Code.  This

section identifies certain enumerated factors, "including" those stated in Section 1307(c)(1) –

(11).  The term "including" is not limiting.  11 U.S.C. § 102(3).  Inherent in the confirmation of

any Chapter 13 Plan is the requirement that the Plan be proposed in good faith.  11 U.S.C. §

1325(a)(3).  In *Marrama v. Citizens Bank of Massachusetts*, the Supreme Court affirmed the

denial of a Chapter 7 Debtor's motion to convert his case to Chapter 13, on the ground that the

Debtor lacked good faith, and therefore, was not "a member of the class of 'honest but

unfortunate debtor[s]' that the bankruptcy laws were enacted to protect."  549 U.S. 365, 374

(2007).  The Supreme Court further noted:

> Nothing in the text of either § 706 or § 1307(c) (or the legislative history of either
> provision) limits the authority of the court to take appropriate action in response to
> fraudulent conduct by the atypical litigant who has demonstrated that he is not entitled to
> the relief available to the typical debtor.  On the contrary, the broad authority granted to

bankruptcy judges to take any action that is necessary or appropriate "to prevent an abuse of process" described in § 105(a) of the Code, is surely adequate to authorize an immediate denial of a motion to convert filed under § 706 in lieu of a conversion order that merely postpones the allowance of equivalent relief and may provide a debtor with an opportunity to take action prejudicial to creditors.

*Id.* at 374-75 (footnotes omitted).

Under the circumstances of this case, the Court finds that the Debtors cannot propose a Plan in good faith, and their case must be converted to Chapter 7.

The Court notes that Mrs. Corum did not attend the June 21st hearing, nor did she attend the August 24th hearing. She did not lie to the Court. However, she did participate in the sale of the Property. She signed the settlement papers, and had them delivered to the settlement agent, without Court approval. Although she is not guilty of lying to the Court, her case will be converted to Chapter 7 as well, for her unauthorized transfer of property of the bankruptcy estate.[6]

Finally, for the reasons stated above, the Court will deny confirmation of the Corum's Amended Plan. The Corums lack good faith in proposing the Plan. 11 U.S.C. § 1325(a)(3). The Court will not permit Mr. and Mrs. Corum to buy a discharge in this case by disgorging the payment that they received from EAG. The Court will deny confirmation of the Corums' Amended Chapter 13 Plan.[7]

2. *Blackwell Title*

Mr. Cheatwood of Blackwell Title has conducted real estate settlements for 27 years. Tr. II at 105. Surprisingly, in those 27 years, this was his first bankruptcy-related settlement. *Id.*

---

[6]  Mr. and Mrs. Corum had adequate notice that their case could be converted to Chapter 7. *See* Order to Show Cause Why Case Should not Be Converted to Chapter 7 or Dismiss, and Why Amounts Paid in Connection with Unauthorized Sale of Property of the Estate Should Not Be Disgorged. Docket No. 38.

[7]  The Court has no idea why the amount to be paid to the Trustee immediately in the Amended Plan is $15,055, nor what the source of these funds may be.

Case 11-16929-BFK   Doc 82   Filed 11/14/12   Entered 11/14/12 16:46:29   Desc Main
Document    Page 15 of 19

In her e-mail of December 27th, Ms. Gill told Mr. Cheatwood in no uncertain terms that the Court had not approved the sale. Yet, despite his actual knowledge of the pendency of the bankruptcy case, and without a Court Order approving the sale, he proceeded to close the transaction on the morning after the Court conditionally denied approval of the sale. It was not until an auditor from the title insurance company told him that he needed to have a Court Order approving the sale that he requested that Mr. Goetz provide him with a Court Order. Tr. II at 106. Had Mr. Cheatwood been more diligent, the sale would not have closed.

Mr. Cheatwood and his firm only charged $275 to conduct the settlement. *HUD-1 Settlement Statement*, Ex. 2, Line 1102. Blackwell Title and/or Mr. Cheatwood may have been paid a premium for the issuance of the title insurance policies to the new Lender and the Purchaser (or, these title policies may not yet have been issued, in light of the proceedings in this Court), but these policies are for the benefit of the new Lender and the Purchaser, not the bankruptcy estate. Accordingly, the fees paid (or to be paid) for these policies are not relevant to the Court's assessment of a sanction against Blackwell Title.

Blackwell Title will be ordered to disgorge the sum of $275, payable to the Chapter 7 Trustee.[8]

### 3. Marjorie Helen Pearce and Fieldstone Real Estate

Ms. Pearce is found to be a purchaser in good faith, for value and without notice of the bankruptcy case. 11 U.S.C. § 549(c). There was no evidence presented that either Ms. Pearce, or her agent at Fieldstone, had any reason to know of the pendency of the bankruptcy case, and no one at either evidentiary hearing suggested otherwise. The Court will not disturb the title of Ms. Pearce in the Property, and will not sanction Fieldstone in any amount.

---

[8] This is without prejudice to the rights or claims that any other parties may have as against Mr. Cheatwood and/or Blackwell Title.

15

*4. Re/Max Choice*

Ms. Gill and Re/Max Choice are another story.  They unquestionably knew of Mr. and

Mrs. Corums' bankruptcy case, from the start.  Ms. Gill knew of the pendency of the case the

day before the closing, on December 27th.  To be fair, Ms. Gill advised the parties that the sale

could not close the following day.  But, once the sale did close, and she received her commission

check, she simply cashed the check and went on about her business.

Ms. Gill (and her firm Re/Max Choice) is a professional who has been paid out of an

asset of the bankruptcy estate.  In determining whether a professional should be compensated,

"one must initially consider whether the employment was authorized by the court."  *In re Gulf*

*Coast Orthopedic Center*, 265 B.R. 318, 322 (Bankr. M.D. Fla. 2001); *see also In re Torrence*

*Co., Inc.,*  2007 WL 134616 (Bankr. E.D. Va. 2007); *In re Tidewater Mem'l Hosp., Inc.,* 110

B.R. 221, 225 (Bankr. E.D. Va. 1989).  Section 327 of the Bankruptcy Code discusses

employment of professionals.  Section 330 of the Code then allows for compensation of those

employed professionals.  "Clearly, if the professional was not authorized to be employed it is not

entitled to any compensation."  *In re Gulf Coast Orthopedic Center*, 265 B.R. at 322.  Ms. Gill's

employment has not been approved by the Court.  *See* 11 U.S.C. § 327.  The commission was

not approved by the Court.  *See* 11 U.S.C. § 330(a).  There are no "extraordinary circumstances"

justifying the payment of the commission to Re/Max Choice here.  To the contrary, even if

Re/Max Choice's employment as a professional had been approved, the Court would still order a

disgorgement of the fee, owing to the firm's actual knowledge of the bankruptcy case and its

involvement in the unauthorized sale of the property.  Therefore, the $7,050 commission it

received was in violation of the Code and is subject to disgorgement.  The Court will order the

disgorgement of the Re/Max Choice commission in the amount of $7,050, payable to the Chapter 7 Trustee.

     *5. EAG*

EAG argues that it should not be sanctioned because it never had notice that the bankruptcy case had been reinstated. EAG was told that the bankruptcy had been dismissed, it had a Notice of Dismissal from the Court, and it had no indication that the case had been reinstated. EAG Ex. 3, p.6. The Trustee argues that the EAG commission was excessive in light of the services provided. It certainly was never approved by the Court (and no approval should be inferred from this Opinion). However, in the Court's view, no bankruptcy purpose would be served by sanctioning a party with no knowledge of the pendency of the bankruptcy case. The Court will decline to sanction EAG, without prejudice to any rights or claims of the Chapter 7 Trustee.

**CONCLUSION**

For the foregoing reasons, the Court will: (a) declare the Purchaser, Ms. Pearce, to be a good faith purchaser for value and approve the sale as a sale to a bona fide purchaser without knowledge of the commencement of the case and for present fair equivalent value under 11 U.S.C. § 549(c); (b) deny confirmation of the Debtors' Amended Chapter 13 Plan and convert the Debtors' case to Chapter 7; (c) decline to sanction the purchaser's agent, Fieldstone Real Estate; (d) sanction the Debtors' real estate agent Re/Max Choice in the amount of $7,050; (e) sanction Blackwell Title & Escrow, LLC, the sum of $275; (f) decline to sanction EAG, without prejudice to whatever rights or claims the Chapter 7 Trustee may assert. All sanctions shall be payable to the Chapter 7 Trustee in this case. In the event, however, that the bankruptcy estate has sufficient funds to pay all administrative expenses, priority claims and allowed unsecured

claims in full, then the Court will order that no funds are to be paid to the Debtors, and any

excess funds shall be returned to the sanctioned parties, pro rata to the amounts that they have

paid into the estate.  A separate Order shall issue.


Date:                                                      _____
                                                           Brian F. Kenney
                                                           United States Bankruptcy Judge



Copies to:

James E. Corum, IV
Christina Marie Corum
P.O. Box 625
Marshall, VA 20116
Debtors

John C. Morgan, Jr., Esquire
98 Alexandria Pike, Suite 10
Warrenton, VA 20186
Counsel for the Debtors

Thomas P. Gorman, Esquire
300 N. Washington St. Ste. 400
Alexandria, VA 22314
Chapter 13 Trustee

RE/MAX Choice
Attn: Christopher Williams
403 E. Main Street
Front Royal, VA 22630

John W. Bevis, Esquire
10521 Judicial Drive, Suite 204
Fairfax, VA 22030
Counsel for RE/MAX Choice

Fieldstone Real Estate
Attn: Marielle van der Burgh
300 East Main Street
Purcellville, VA 20132

John Cheatwood
Blackwell Title & Escrow, LLC
28 E. Lee Street
Warrenton, VA 20186

Alex Ciaccio, Managing Partner
EAG & Associates, LLC
5325 Paylor Lane, Suite #200
Sarasota, FL 34240

James M. Towarnicky, Esq.
3977 Chain Bridge Rd.., Ste. 1
Fairfax, VA 22030
Counsel to EAG and Alex Ciaccio

Joseph A. Guzinski, Esquire
Assistant United States Trustee
115 South Union Street, Suite #210
Alexandria, VA 22314

Ocwen Loan Servicing, LLC
Attn: Bankruptcy Department
1661 Worthington Rd, Suite 100
West Palm Beach, FL 33409